**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* | ) | |
| **WILLIAM ROBIN HOOD,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs/Relators,** | ) | **Civil Action No. 11-774 (RMC)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **SATORY GLOBAL, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**OPINION**

Plaintiffs William Robin Hood and Troy Maxon, information technology
specialists, moved across the country to work for Satory Global, LLC in Washington, D.C.
Plaintiffs were assigned to do work for the Department of Justice pursuant to a subcontract
Satory held for information technology support services. They allege that, upon beginning work,
they learned that Satory was fraudulently billing the Department of Justice by charging for time
spent on private corporate development work instead of on the contract and by performing its
subcontracting tasks in an inefficient, unethical way that guaranteed Satory future contracting
work. When Mr. Robin raised concerns to his supervisor and to Satory management, he was
terminated; Mr. Maxon contends that he was constructively discharged shortly thereafter.
Plaintiffs then brought a *qui tam* suit under the False Claims Act and District of Columbia
common law. After the United States declined to intervene in the case, Plaintiffs served the
Complaint on Satory, which now moves to dismiss. For the reasons set forth below, the Court
will grant the motion to dismiss in part and deny it in part.

## I. FACTS

### A. Plaintiffs Join Satory

Plaintiffs are two computer experts, William Robin Hood[1] and Troy Maxon, who were recruited for Satory[2] by a recruiting firm called Global IT Resources in July 2010. Compl. [Dkt. 1] ¶ 3. Satory recruited them to work on a Department of Justice ("DOJ") contract ("the Contract") for which Satory was the subcontractor to Access Systems, Inc., the prime contractor. *Id.* The Contract was for "Information Technology ('IT') Support Services" and was a "Multiple Award Contract under which twelve prime contracts were awarded, each of which [was] an Indefinite Delivery/Indefinite Quantity, Time and Material contract." *Id.* ¶ 4. The contract had a "schedule of fixed unit price Labor Hour rates." *Id.* Satory's work was performed at a DOJ building at 2 Constitution Square, N.E., in Washington, D.C. called "2Con," where the DOJ Enterprise Services Staff-Infrastructure Development project ("ESS/ID") was located. *Id.* ¶ 5.

Both Messrs. Robin and Maxon agreed to move to the Washington, D.C. area with their families to take positions with Satory in the late summer of 2010—Mr. Robin from Hawaii and Mr. Maxon from Oregon. *Id.* ¶¶ 14–16, 18–19. On August 5, 2010, Satory sent Mr. Robin an Offer Letter for a position as "Associate I" at a monthly salary of $11,166.66, plus benefits and a possible bonus. *Id.* ¶ 14; *see also* Def. Mot. Dismiss ("Def. MTD") [Dkt. 16], Ex. 1 [Dkt. 16-1] (Robin Offer Letter).[3] Mr. Robin's "initial role" was to be SharePoint

---

[1] The documents in the case are inconsistent between referring to "Mr. Robin" or "Mr. Hood." The Court will use "Mr. Robin" in this Opinion, consistent with the Complaint.

[2] Satory has noted that its proper name is "Satory Global, LLC," not "Satory Global, Inc." as alleged in the Complaint. *See* Def. Mot. Dismiss [Dkt. 16] at 1.

[3] As Plaintiffs bring claims for breach of contract based on their offer letters and relocation reimbursement agreements, the documents are incorporated to the complaint, and the Court may consider them on a motion to dismiss. *See Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

Administrator with the "primary responsibility" of "support[ing] the [operations & maintenance] mission of the infrastructure delivery and shared services teams with [DOJ]."  Robin Offer Letter at 1.   The Offer Letter also listed various "[o]ther duties" and stated: "these activities and services may change."  *Id.*  The second page of the Offer Letter, next to Employment Status, stated: "Your employment with the Company is 'at-will' and you will not be entered into a contract of employment."  *Id.* at 2.  Mr. Robin was provided a Relocation Expense Reimbursement and Repayment Agreement, offering him $15,000 for relocation expenses. Compl. ¶ 14; *see also* Def. MTD, Ex. 3 [Dkt. 16-3] (Robin Relocation Agreement).  The Relocation Agreement also included: "Employment is at-will at all times."  Robin Relocation Agreement at 1.  Mr. Robin executed the Offer Letter on August 9, 2010 and the Relocation Agreement on August 10, 2010; the Relocation Agreement was countersigned by Haldane Smith of Satory on September 2, 2010.

Mr. Maxon signed a substantially similar Offer Letter on August 26, 2010, and a substantially similar Relocation Agreement on October 4, 2010.  *See* Def. Mot. Dismiss, Ex. 2 [Dkt. 16-2] (Maxon Offer Letter); *id.*, Ex. 4 [Dkt. 16-4] (Maxon Relocation Agreement).  Mr. Maxon accepted Satory's offer to work as an "Associate II" at a monthly salary of $11,250, plus benefits, Maxon Offer Letter at 2, and he was offered $10,000 in relocation expenses, Maxon Relocation Agreement at 1.  His initial role was to be "SharePoint Solutions Architect," although the Offer Letter also included a non-exhaustive list of possible "[s]pecific assignments."  *Id.* at 1. As with Mr. Robin, both Mr. Maxon's Offer Letter and Relocation Agreement stated that his employment would be at will.  *Id.* at 2, Maxon Relocation Agreement at 1.

### B.  I&T Lab and Lab Migration

Instead of working as a SharePoint Administrator when he arrived, Mr. Robin was assigned by his supervisor, Joaquin Jesus Rosario, to "rebuild an existing development lab,"

called the DevLab.  Compl. ¶ 20.  A development lab is "a computer environment in which

contractors and DOJ personnel are able to test new software in a safe environment . . . without

worrying about interfering with ongoing operations."  *Id.*  Mr. Robin completed the DevLab

project in about three weeks.  *Id.* ¶ 22.  He was then assigned by Anne Isaacs, CEO, Founder,

and Managing Partner of Satory, "to migrate the existing DOJ Integration & Test ['I&T'] Lab"

from another contracting firm in Alexandria, Virginia, to 2Con (the "Lab Migration Project").

*Id.* ¶¶ 13, 23.  Mr. Robin was "frustrated with the menial work he was assigned" and displeased

that he was not working as a SharePoint Administrator, and he complained to his recruiter at

Global IT Resources and to Mr. Rosario.  *Id.* ¶¶ 25–26.

Mr. Robin worked on the Lab Migration project in October 2010.  In doing so, he

"became aware of Satory practices that he considered to be unethical," such as Mr. Rosario's

instruction that Mr. Robin "not . . . meet with any DOJ personnel or other contractors without

one of Satory management present," even though Mr. Robin needed to contact those persons to

complete the Lab Migration Project.  *Id.* ¶ 27.  Satory employees gave Mr. Maxon "the same

instructions."  *Id.*  Mr. Rosario's "instruction made [Mr.] Robin's job as Project Manager for the

migration of the I&T Lab to the 2Con building difficult, costly and inefficient," and DOJ

personnel and other contractors, frustrated with Mr. Rosario's "lack of competence," began

contacting Mr. Robin for help directly.  *Id.* ¶¶ 28–29.

Mr. Rosario then "told [Mr.] Robin that Satory wanted to make sure that two

servers in the Lab were configured so as to be dedicated to Satory, even though they were DOJ

property and needed to be used by all contractors."  *Id.* ¶ 30.  Mr. Robin objected because doing

so "would be configuring a gateway into the I&T Lab and the 2Con lab, which would pose time-

consuming obstacles to shared usage . . . waste money, alienate other contractors, and benefit

Satory with control of all lab projects to the financial detriment of DOJ." *Id.* According to

Plaintiffs, Mr. Rosario gave this direction "because under the DOJ Contract, a task order could

be awarded without competition only if it met one of four exceptions," including that "only one

contractor can provide services," and Mr. Rosario "hoped to position Satory to receive no-

competition task orders." *Id.* Mr. Robin completed the Lab Migration Project on November 6,

2010. *Id.* ¶ 31. A DOJ representative, Christopher Greer, then asked Satory to take over Lab

Management for DOJ from another contractor and requested that Mr. Robin become Lab

Manager. *Id.* ¶ 32. Satory was required to prepare a Lab Manager job description. Although

Ms. Isaacs originally assigned a different Satory employee to define the Lab Manager job

description, that person was unable to complete the task and was replaced by Mr. Robin. *Id.*

¶¶ 33–34.

### C.  Off-Contract Work at DOJ Facilities

According to Plaintiffs, in October 2010, Ms. Isaacs invited a Microsoft

contractor, Carol Corneby, to meet with Satory at 2Con to "create a business proposal for Satory

to present to Microsoft," notwithstanding that Ms. Corneby "had no business with DOJ and was

not working on the DOJ Contract." Compl. ¶ 35. Satory personnel—including "Craig Foote,

Ivory Banks, [Brian] Seitz, Barry Hartzberg, Anne Isaacs, Mary Egesdal, Silvana Nani, [Mr.]

Rosario, [Jeff] Webb, and [Mr.] Robin"—and Ms. Corneby formed a "Working Group" that

"worked for 10 hours a day, including weekends, for four to six weeks." *Id.* ¶¶ 36–37. The

Working Group's goal was to create "a proposal and presentation to present to Microsoft in the

hopes that Microsoft would recommend Satory to Viacom and Iron Mountain as Microsoft

Partners capable of delivering a quality Records Management solution." *Id.* Even though they

were "actively involved almost every day in the private Satory corporate business development

effort during normal business hours," the Working Group "billed 40 hours to the DOJ contract

every week" through October, November, and December. *Id.* When Messrs. Maxon, Robin, and Seitz and Ms. Corneby "asked whether it was appropriate to be conducting private corporate Satory business in government facilities and using government resources, power, materials, and email," Ms. Isaacs "instructed [them] to keep working and not worry about it." *Id.* The collaboration among Ms. Corneby and the Satory personnel ended when Ms. Isaacs "tried to usurp" Ms. Corneby's "propriet[ary] solution" and present it to Microsoft herself. *Id.* ¶ 38.

Plaintiffs allege that Satory worked on other Satory corporate projects while using DOJ resources, on DOJ property. According to Plaintiffs, Satory "worked on a huge initiative to build the Satory Corporate Cloud Architecture and SharePoint Internet & Intranet Portal while working at DOJ's 2Con building and using DOJ's facilities, power, phones and resources." *Id.* ¶ 39. This initiative involved "most everyone employed by Satory at the DOJ Site" throughout "[m]ost of every day from December [2010] through at least March of 2011." *Id.* Messrs. Maxon, Webb, and Rosario, along with Craig Foote, Amol Kaikini, Ivory Banks, and Mary Egesdal led these efforts, although Messrs. Maxon, Seitz, and Robin, as well as Ms. Corneby, "spoke up to question this behavior." *Id.* ¶¶ 39–40.

Satory also allegedly treated DOJ's 2Con building as its corporate headquarters, including by: (1) "install[ing] a private internet wireless broadband network;" (2) having its Staffing Director, Betty Lauricia, work in a DOJ cubicle exclusively doing "Satory corporate business;" (3) conducting "employee performance reviews and health insurance briefings . . . in DOJ conference rooms using DOJ projectors and white boards, phones, and other resources;" and (4) arranging for "outside vendors to come onsite at DOJ's 2Con building to make presentations to Satory staff on Satory business matters not related to DOJ or the government in any way." *Id.* ¶¶ 41–44. Plaintiffs also aver that Barry Hartzberg, a Satory Partner and COO,

"came into DOJ['s] 2Con building and conducted nothing but Satory corporate business," for "almost 20 hours a week." *Id.* ¶ 43.  According to Plaintiffs, no other contracting firm used DOJ resources in this manner.

### D.  Mr. Robin's December 2010 Meeting; January 2011 Events

Mr. Robin completed configuring the 2Con Lab on December 6, 2010.  Compl. ¶ 46.  On December 23, 2010, Messrs. Rosario, Hartzberg, and Ryan Elliott of Satory conducted an "informal performance review" for Mr. Robin.  *Id.* ¶ 47.  Mr. Robin "was told that they were very happy with his work ethic, the job he was doing, and the quality of his work," and he received a "$1,000 performance bonus and a $5,000 bonus in advance for the upcoming six months." *Id.*  Mr. Robin again asked to work as the SharePoint Administrator, as he believed he had been offered when accepting employment with Satory, but at the request of DOJ, Mr. Robin agreed to serve as Lab Manager instead for the "short term." *Id.* ¶¶ 48–49.

Mr. Robin then set out to "creat[e] a Virtual Lab Team of [Subject Matter Experts] who would work together to re-organize and architect the [DevLab]." *Id.* ¶ 50.  Mr. Rosario again interfered, proposing that Mr. Rosario himself serve as Lab Manager or that Mr. Robin configure the DevLab in such a way that it would give Satory exclusive control over access. *Id.*  Mr. Robin objected, telling Mr. Rosario and other Satory personnel "that DOJ Leadership and all [Subject Matter Experts] should be involved in the Governance, Process, and Access to the Lab" and that he was concerned that "Satory was trying to 'rig the game' by defining how Projects would flow through the DOJ Lab." *Id.* ¶ 51.  This concerned Mr. Robin because "[c]onventional architecture" would require a Lab Manager to "define, implement, maintain and support the 'Governance' of the DOJ Labs by building a Virtual Lab Team of all the [Subject Matter Experts] from all Cont[r]acting Firms with DOJ ESS/ID" so that the entire team would supervise access to the DevLab. *Id.* ¶ 52.  The manner in which Mr. Rosario

7

directed Mr. Robin to design the DevLab positioned Satory to "[b]e the first contracting company aware of any new projects or head count needs coming down the line;" "[m]ake it impossible for any other contracting company to be successful in any project without Satory," thereby allowing Satory to bill DOJ for project management work; "[c]ontrol all project manager tools and the SharePoint Team" as "gatekeeper and governance board;" and "attach billable hours to all documentation, communication, and collaboration efforts at DOJ ESS/ID."  *Id.* ¶ 60.

Mr. Robin expressed his concerns to Mr. Rosario on January 11, 2011, which led to a "short but heated" conversation.  *Id.* ¶¶ 53–54.  Mr. Robin also sent an e-mail to upper Satory management, stating in part that "DOJ Leadership [should] be made aware of Satory's proposal for controlling access to the DOJ Lab."  *Id.* ¶ 55.  This angered Mr. Rosario, who "berated" Mr. Robin for the e-mail.  *Id.*

On January 12, 2011, Mr. Robin met with Messrs. Rosario and Elliott, again expressing his concerns about the way in which he was being directed to administer the DevLab, which would give Satory "a significant unfair advantage over any other contracting firm at DOJ in delivering projects faster, with higher quality, and more [efficiency] than other contracting firms" and would allow Satory to "bill more hours for DOJ work than actually was needed."  *Id.* ¶¶ 56–58.  Messrs. Rosario and Elliott "refused to address [Mr.] Robin's concerns," which led Mr. Robin to inform them that Mr. Rosario "had instructed him to make sure that the Dell R710 servers currently in the DevLab and owned by the DOJ were to be configured so that only Satory could use them" and that "[Mr.] Rosario had configured another DOJ server that formerly belonged to the I&T Lab to serve only Satory."  *Id.* ¶ 59.  Mr. Rosario "yelled and cursed at [Mr.] Robin and left."  *Id.*  Mr. Robin sent Messrs. Rosario and Elliott an e-mail "hoping to work things out . . . but objecting to being cursed for his opinions;" neither responded.  *Id.* ¶ 61.

### E.  Retaliation Allegations

After the meeting on January 12, 2011, Satory removed Mr. Robin from his position as Lab Manager, directed him to work from home, instructed others not to contact him, and "did not assign him any new work."  *Id.* ¶ 62.  On January 13, 2011, Mr. Robin sent CEO Isaacs an e-mail "repeating the concerns he had expressed to others."  *Id.* ¶ 63. Mr. Robin attended a meeting with Ms. Isaacs and Peg Gamse, a human resources representative, on January 20, 2011, in which he "informed them that Satory was being unethical in attempting to 'game' the system of governance of the labs;" they responded by "accus[ing] him of being at fault."  *Id.* ¶ 64.  After the meeting, Mr. Maxon officially replaced Mr. Robin as Lab Manager. *Id.* ¶ 65.  Mr. Robin was offered a written separation agreement on March 17, 2011 worth $28,141, including cash payment of $9,000.  *Id.* ¶ 69.  The proposed separation agreement included a confidentiality provision and had a deadline for acceptance of April 8, 2011.  *Id.* ¶¶ 69, 73.  Mr. Robin was terminated on March 17, 2011, and he did not accept the separation agreement, although "[s]everal Satory personnel communicated with him repeatedly from April 8 to April 12 trying to get him to respond."  *Id.* ¶ 73.

On March 8, 2011, Mr. Maxon, who "had complained to supervisors about conducting corporate work on DOJ property and with DOJ resources" and "incompetent management of the DOJ project and inefficiencies [in] performing the DOJ work," resigned "because of the abusive conduct he saw at Satory."  *Id.* ¶ 68.

### F.  Procedural History

Plaintiffs filed their Complaint under seal on April 22, 2011.  The Complaint consists of seven counts, including four under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–33.  Plaintiffs' claims are: presentation of false claims in violation of 31 U.S.C. § 3729(a)(1)(A) (Counts I and II), use of false statements and records in violation of 31 U.S.C.

§ 3729(a)(1)(B) (Count III), FCA retaliation in violation of 31 U.S.C. § 3730(h) (Count IV),

wrongful termination under D.C. law (Count V), breach of employment contract under D.C. law

(Count VI), and punitive damages (Count VII).  From April 22, 2011, until October 19, 2012,

this case remained under seal while the United States investigated Plaintiffs' allegations and

determined whether it would intervene.  Once the United States filed notice that it declined to

intervene, *see* Dkt. 12, the Complaint was unsealed and served upon Satory, which filed a motion

to dismiss the Complaint in its entirety, *see* Dkt. 16 ("Def. MTD").  Plaintiffs then filed their

Opposition, *see* Dkt. 20 ("Pls. Opp."), and Satory filed a Reply, *see* Dkt. 21 ("Def. Reply").

        In its reply brief, Satory noted that Mr. Robin had died during the week of

March 4, 2013.  Def. Reply at 1 n.1.  The Court directed Plaintiffs' counsel to confirm that

statement and address whether Mr. Robin's FCA claims survive his death.  *See* Minute Order

dated April 29, 2013.  Plaintiffs' counsel confirmed Mr. Robin's death, *see* Mot. Extension of

Time, Dkt. 22, at 1, and submitted a memorandum providing authority for the proposition that

FCA claims do survive death.  *See* Statement Regarding Survival [Dkt. 23].  Because the Court

concludes that FCA claims survive the death of the plaintiff-relator for the reasons set forth

below, a timely motion from Plaintiffs' counsel to substitute a successor-in-interest for Mr.

Robin as plaintiff will be granted.

## II.  LEGAL STANDARDS

### A.  Motion to Dismiss

        A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)

challenges the adequacy of a complaint on its face, testing whether a plaintiff has properly stated

a claim.  Fed. R. Civ. P. 12(b)(6).  Federal Rule of Civil Procedure 8(a) requires that a complaint

contain "a short and plain statement of the claim showing that the pleader is entitled to relief."

Fed. R. Civ. P. 8(a)(1).  A complaint must be sufficient "to give a defendant fair notice of what

the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).  Although a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief  "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*  The facts alleged "must be enough to raise a right to relief above the speculative level." *Id*.  Rule 8(a) requires an actual showing and not just a blanket assertion of a right to relief. *Id.* at 555 n.3.  "[A] complaint needs *some* information about the circumstances giving rise to the claims." *Aktieselskabet Af 21. Nov. 2001 v. Fame Jeans, Inc.*, 525 F.3d 8, 16 n.4 (D.C. Cir. 2008) (emphasis in original).

In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007) (internal quotation marks and citation omitted).  To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face." *Twombly*, 550 U.S. at 570.  When a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, then the claim has facial plausibility. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.

A court must treat the complaint's factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555.  But a court need not accept as true legal conclusions set forth in a complaint. *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.  "While legal conclusions can

provide the framework of a complaint, they must be supported by factual allegations.  When

there are well-pleaded factual allegations, a court should assume their veracity and then

determine whether they plausibly give rise to an entitlement to relief."  *Id*. at 679.

### B.  Heightened Pleading Requirement for Fraud

Federal Rule of Civil Procedure 8 requires that every complaint include "a short

and plain statement of the claim showing that the pleader is entitled to relief" and that "each

allegation . . . be simple, concise, and direct."  Fed. R. Civ. P. 8(a), (d)(1).  "[B]ecause the False

Claims Act is self-evidently an anti-fraud statute, complaints brought under it must [also] comply

with Rule 9(b)."  *United States ex rel. Totten v. Bombardier Corp.*, 286 F.2d 542, 551–52 (D.C.

Cir. 2002) (noting uniform approach of circuit courts to this issue).  Federal Rule 9(b) provides a

heightened pleading standard for a party alleging fraud or mistake, requiring any such party to

"state with particularity the circumstances constituting fraud or mistake.  Malice, intent,

knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P.

9(b).

The D.C. Circuit has noted that Rules 8 and 9(b) are not contrary to one another,

but should be read in conjunction.

> [T]his means that the pleader must state the time, place and content
> of the false misrepresentations, the fact misrepresented and what
> was obtained or given up as a consequence of the fraud. The rule
> serves to discourage the initiation of suits brought solely for their
> nuisance value, and safeguards potential defendants from frivolous
> accusations of moral turpitude.  .  .  .  And because "fraud"
> encompasses a wide variety of activities, the requirements of Rule
> 9(b) guarantee all defendants sufficient information to allow for
> preparation of a response.

*United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981) (internal quotation

marks and citations omitted); *see also United States ex rel. Williams v. Martin-Baker Aircraft

Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004); *McQueen v. Woodstream Corp.*, 248 F.R.D. 73, 77

(D.D.C. 2008) ("Rule 9(b) simply requires the pleader to provide a higher degree of notice by adequately alleging all of the requisite elements for the cause of action invoked." (citing, *inter alia*, *Alicke v. MCI Commc'ns Corp.*, 111 F.3d 909, 912 (D.C. Cir. 1997))).  Rule 9(b) is satisfied when the pleader "provide[s] the 'who, what, when, where, and how' with respect to the circumstances of the fraud." *Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250, 253 (D.D.C. 2004).

Pleading on information and belief for claims subject to the strictures of Rule 9(b) is permitted when essential information lies uniquely within another party's control. *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994) (citing *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 646 (3d Cir. 1989)).  To plead on information and belief, however, the plaintiff must allege "that the necessary information lies within the defendant['s] control" and include "a statement of the facts upon which the allegations are based." *Id.* (citations omitted); *see also Anderson*, 221 F.R.D. at 253.

### C.  Jurisdiction and Venue

The Court has federal question jurisdiction over Plaintiffs' FCA claims under 28 U.S.C. § 1331 and supplemental jurisdiction over their state law claims under 28 U.S.C. § 1367. Venue is proper in this District under 31 U.S.C. § 3732(a) (providing for venue "in any judicial district in which the defendant . . . resides, transacts business, or in which any act proscribed by [31 U.S.C. §] 3729 occurred").

### III.  ANALYSIS

In its motion to dismiss, Satory asserts that Plaintiffs have failed to state a claim on any of the seven counts in the Complaint, characterizing this lawsuit as "simply a case of disgruntled former employees now trying to couch their employment grievances as a violation of the [FCA]." Def. Reply at 2.  The Court will first provide relevant background as to procedure

in FCA cases.  It will then address whether Mr. Robin's death during the pendency of this case extinguishes his FCA claims.  Finally, the Court will rule on the motion to dismiss on each of the claims advanced by the Plaintiffs.

### A.  Procedure in FCA Cases Generally

The FCA's "chief purpose . . . is to prevent the commission of fraud against the federal government and to provide for the restitution of money that was taken from the federal government by fraudulent means."  *United States ex rel. Purcell v. MWI Corp.*, 824 F. Supp. 2d 12, 15–16 (D.D.C. 2011) (citation omitted).  First enacted in the time of President Lincoln to stem chicanery in Civil War defense contracts, the FCA provides civil penalties for, *inter alia*, submission of false claims to the United States government.  Private parties, called relators, are permitted to sue for violations of the FCA in the name of the United States.  31 U.S.C. § 3730(b)(1).  Special procedures apply in such cases, which are called *qui tam* actions—"short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which means 'who pursues this action on our Lord the King's behalf as well as his own.'"  *Vt. Agency of Nat'l Res. v. United States ex rel. Stevens*, 529 U.S. 765, 768 n.1 (2000).  The complaint, which is not initially served on the defendant, is filed *in camera* and the case is placed under seal.  31 U.S.C. § 3730(b)(2).  At the time of filing, the plaintiff-relator must serve the complaint on the United States and make "written disclosure of substantially all material evidence and information the [plaintiff] possesses."  *Id.*  Thereafter, the case is effectively stayed for sixty days, plus any extensions, while the United States determines whether it will intervene—that is, whether it will "proceed with the action, in which case the action shall be conducted by the Government; or . . . decline[ ] to take over the action, in which case the person bringing the action shall have the right to conduct the action."  *Id.* § 3730(b)(4).  If the government declines to intervene, the complaint is unsealed, and the plaintiff-relator may proceed with the case.  Even

14

in cases in which the government has declined to intervene, the government retains special rights atypical in traditional civil actions, such as the right to intervene at any time for good cause, *id.* § 3730(c)(3), and the right to petition the Court for a stay of discovery, *id.* § 3730(c)(4).

### B.  FCA Claims Survive the Death of the Relator-Plaintiff

Mr. Robin's death requires the Court to address whether his FCA claims against the government are extinguished or whether they survive his demise as part of his estate.  When a federal statute contains no explicit statement on survival rights, as is true of the FCA, the general rule under federal common law is that rights of action under federal statutes survive a plaintiff's death if the statute is remedial, not penal.  *See Ex parte Schreiber*, 110 U.S. 76, 80 (1884); *see also* Wright & Miller, 7C Fed. Prac. & Proc. Civ. § 1954 (3d ed.) ("It is still the rule that penal actions do not survive but courts generally have held that treble-damage provisions are remedial and that actions of that kind survive.").

In the leading case addressing whether an FCA claim survives the death of the relator-plaintiff, *United States v. NEC Corp.*, 11 F.3d 136 (11th Cir. 1993), the Eleventh Circuit answered the question in the affirmative.  *NEC Corporation* applied the three-factor *Murphy* test for survival of rights of action under federal statutes, *see Murphy v. Household Finance Corp.*, 560 F.2d 206, 209 (6th Cir. 1977), and concluded:

> The structure and underlying policy of the FCA convince us that the statute's *qui tam* provisions are remedial in nature. The purpose of the *qui tam* provisions is to provide individuals with incentive to inform the government of fraudulent activity and to compensate such relators for the time and expense of coming forward with such information. The *qui tam* provisions are remedial and in no way act to penalize the FCA defendant. We therefore hold that a relator's *qui tam* action survives his death.

11 F.3d at 139.

With one exception, "[t]he few [district] courts that have considered the issue have concluded that the *qui tam* action survives the death of the relator. In such a circumstance, a personal representative of the relator's estate may proceed with the case." Claire M. Sylvia, *The False Claims Act: Fraud Against the Government* § 11:98 (West 2010 & Supp. 2012) (collecting cases). The sole exception is *United States ex rel. Harrington v. Sisters of Providence in Oregon*, 209 F. Supp. 2d 1085 (D. Ore. 2002), which rejected *NEC Corporation* and found that FCA claims do not survive a relator-plaintiff's death. *Harrington*, however, has been criticized by commentators and in subsequent decisions for finding that the FCA was exclusively punitive in that case. The Supreme Court has since clarified in that the FCA serves dual punitive and remedial purposes. *See Cook County, Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 129–35 (2003); *see also United States ex rel. Colucci v. Beth Israel Med. Ctr.*, 603 F. Supp. 2d 677, 680–82 (S.D.N.Y. 2009) (concluding that *Chandler* undermined the reasoning of *Harrington* and agreeing with "the majority of courts that have considered the question . . . that *qui tam* actions brought under the FCA survive the death of the relator").

The Court agrees with the reasoning of *NEC Corporation* and the nearly unanimous district courts that FCA claims survive the death of the relator-plaintiff. Upon a timely motion to substitute, a personal representative of Mr. Robin's estate may proceed with the case. *See* Fed. R. Civ. P. 25(a)(1) (requiring a motion to substitute to be filed within 90 days of filing of a suggestion of death). If no motion to substitute is timely filed, Mr. Robin will be dismissed as a relator-plaintiff.

## C. Counts I & II: Presentation of False Claims

In Counts I and II, Plaintiffs allege that Satory presented false claims to the Government by knowingly submitting false and fraudulent invoices for payment under its DOJ contract "on or about every two weeks, from August 2010 to the present . . . to the DOJ

[Contracting Officer's Technical Representative], Government Task Mangers, and Contracts Management Service."  Compl. ¶ 75.  Plaintiffs aver that Satory submitted the invoices "along with a Form DD 250, or equivalent document, certifying that Satory's billing conformed to the contract," even though "the services did not conform to the contract because Satory billed for work that was performed for Satory's own benefit and not for the DOJ contract" and that "did not meet the standards called for under the DOJ contract.  *Id.* ¶¶ 75, 77.

Satory argues that Messrs. Robin and Maxon have failed to plead fraud with particularity under Rule 9(b) because they "do not identify any particular fraudulent claim for payment that was submitted by Satory to the U.S. Government, the date of any such claims, the content of any such claims, the work for which the Government was actually billed, the individuals involved in the billing, or the length of time between the alleged fraudulent practice and the submission of any claim for payment."  Def. MTD at 6.  Satory complains that "the Complaint is surprisingly devoid of any details as to a specific fraudulent invoice, the amount of any invoice, who submitted the invoice, and when the invoice was ultimately paid."  *Id.* at 8; *see also* Def. Reply at 10.  Characterizing the Plaintiffs' allegations as "general dissatisfaction with their job assignments and their belief that Satory engaged in conduct in violation of its contract," Satory argues that "the Relators merely allege actions that they believe might have violated Satory's government contract[,] but not the FCA."  Def. MTD at 8–9; *see also* Def. Reply at 7.

Plaintiffs respond that they sufficiently alleged a "factually false" claim submission in Count I by averring that Ms. Isaacs "invited a Microsoft records management expert [Ms. Corneby] to the 2Con building . . . to create a presentation to Microsoft in the hopes that Microsoft would recommend Satory's work to other companies" and that she required Satory employees to work on that effort, which "was completely unrelated to the DOJ contract."

Pls. Opp. at 9.  Plaintiffs also note that they alleged that Satory "took on a major initiative to build its own Corporate Cloud Architecture and SharePoint Internet & Portal from the offices in the 2Con building" and that several Satory employees, identified by name, billed 40 hours to DOJ per week "in October, November, and December" of 2010.  *Id.* at 9–10.

In Count II, Plaintiffs argue that they satisfied the requirements of Rule 9(b) by alleging that "Satory did not perform the services requested by the DOJ" because it "commandeered DOJ property for its own use and abused its access to the DOJ's computer infrastructure to erect obstacles for other contractors and position itself to receive additional, and sometimes unnecessary work," thus "rendering [Satory's] claim for payment for the requested services factually false."  Pls. Opp. at 10.  Their allegations were sufficiently specific, Plaintiffs contend, because they "alleged that at the direction of [Ms.] Isaacs and [Mr.] Rosario, Satory 'submitted invoices under the contract on or about every two weeks' and that in October, November, and December of 2010, those bi-weekly invoices contained hours that certain named employees spent on non-DOJ projects and work that did not conform to the contract."  *Id.* at 12–13.  To the extent that they did not allege "invoice numbers and invoice dates" in the Complaint, Messrs. Maxon and Robin argue that those items are "within the exclusive control of Satory and the DOJ," relieving them from any lack of specificity on that point under the D.C. Circuit's decision in *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1258 (D.C. Cir. 2004).  Pls. Opp. at 13 (arguing that the Plaintiffs were "information technology experts working on the front lines of the construction of the DOJ's sensitive technology infrastructure" and that the FCA was enacted "to encourage sophisticated insiders like [Messrs. Robin] and Maxon to come forward and report fraudulent activity").

The FCA imposes liability on "any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).[4] There are three elements to an FCA presentment claim under § 3729(a)(1)(A): (1) the defendant presented a claim for payment or approval to the government, (2) the claim was "false or fraudulent," and (3) the defendant acted knowing that the claim was false. *See United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 198 (D.C. Cir. 1995). A "claim," as relevant here, is "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that is presented to an officer, employee, or agent of the United States." 31 U.S.C. § 3729(b)(2)(A)(i). The term "knowingly" means that a person either "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information," but it does not require "proof of specific intent to defraud." *Id.* § 3729(b)(1).

The Court cannot agree with Satory that the Plaintiffs have not identified any "false or fraudulent" claim allegedly submitted and its characterization of the Plaintiffs' allegations as mere "job dissatisfaction." Messrs. Robin and Maxon set forth allegations that Satory, through at least Ms. Isaacs and Mr. Rosario, had an ongoing scheme to bill for work that was not compliant with the DOJ contract in two respects: (1) Satory used DOJ facilities and resources for its own private corporate purposes while billing DOJ for its time, and (2) Satory constructed DOJ IT contract deliverables in a manner that was inefficient and contrary to

---

[4] 31 U.S.C. § 3729 was amended in May 2009, *see* Pub. L. 111-21, § 4(a), 123 Stat. 1621 (May 20, 2009), and § 3730 was amended in July 2010, *see* Pub. L. 111-203, Title X, § 1079 A(c), 124 Stat. 2079 (July 21, 2010). The post-amendment versions apply to the allegations here, all of which took place in late 2010 or early 2011. Subsection (a)(1)(A) was subsection (a)(1) in the earlier version of the statute.

industry standards and in a way that positioned Satory to have exclusive access to future IT

contracts at DOJ.  *E.g.*, Compl. ¶ 52 (describing how "[c]onventional architecture" of a

development lab would involve a Lab Manager who formed a team of subject-matter experts

from all constituents, including DOJ and all contractors), ¶ 60 (describing how Mr. Rosario

directed Mr. Robin to structure the DevLab so that it would be "impossible for any other

contracting company to be successful in any project without Satory" billing DOJ for project

management work).  Non-conforming service cases—i.e., those in which a company bills for

"employee work that was not performed" and "overcharge[s]" for services provided—clearly fall

within the scope of the FCA.  *See United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186,

197 n.13 (D.D.C. 2011) (describing such allegations as "paradigmatic FCA claims," quoting

*United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.D.C. 2010)); *see also*

*United States v. TDC Mgmt. Corp., Inc.*, 288 F.3d 421, 426 (D.C. Cir. 2002) ("TDC thus

defrauded the government by presenting reports in support of payment that omitted information

indicating that it was acting in a manner that was contrary to the core terms of the Program.").

Such claims, called "false certification" claims, proceed on the notion that the contractor falsely

certified compliance with the contract and fall within the scope of the FCA.  *See Sci.*

*Applications*, 626 F.3d at 1266 (citing *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001)).

Whether Plaintiffs can ultimately prevail is a separate question; at this point, taking their factual

allegations as true, Plaintiffs have adequately alleged that Satory presented a "factually false"

claim to the Government in that Satory "incorrectly describe[d] the goods or services provided."

*United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 64

(D.D.C. 2007) (quoting *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 345 (D. Conn.

2004)).

The Court also finds that the allegations made by Messrs. Robin and Maxon comply with Rule 9(b). A plaintiff's task is to "plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 685 F. Supp. 2d 129, 133 (D.D.C. 2010) (citation and internal quotations omitted), because "[w]hile . . . Rule 9(b) requires more particularity than Rule 8 . . . Rule 9(b) does not completely vitiate the liberality of Rule 8." *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F. Supp. 2d 258, 269 (D.D.C. 2002). Plaintiffs' allegations are certainly sufficient to put Satory on notice of the alleged fraud. Plaintiffs have alleged the who (CEO Ms. Isaacs, and supervisor Mr. Rosario, among others), the what (billing DOJ for time spent on private corporate business and structuring IT systems in an inefficient manner that would rig future contract procurement in Satory's favor), the when (October 2010 through January 2011), the where (the 2Con DOJ building), and the how (by billing for private time and by exploiting its contracting position to make future contracting opportunities more likely). *See United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 339–40 (S.D.N.Y. 2004) (finding that plaintiff's FCA complaint stated a claim where it "satisfie[d] the 'who,' 'what,' 'where,' 'when,' and 'how' requirements for pleading fraud").

While Satory attempts to make much of the fact that Plaintiffs have not been more specific as to the "details [of] the alleged fraudulent invoices," *see* Def. MTD at 8, Def. Reply at 10–12, Messrs. Robin and Maxon have clearly put Satory on notice of the nature of the alleged fraud and averred that Satory submitted "false and fraudulent" certifications for "services [that] did not conform to the contract because Satory billed for work that was performed for Satory's own benefit and not for the DOJ contract" and "that did not meet the standards called for under the DOJ Contract." Compl. ¶¶ 75, 77. Plaintiffs' inability to allege more details about the

invoices submitted by Satory is of no significance at this stage of the case because, as Plaintiffs

note, *see* Pls. Opp. at 13, they have alleged that they were front-line IT workers who had no

direct access to the bills Satory submitted to DOJ.  Accepting Satory's argument that Plaintiffs'

Complaint must fail without specific invoice numbers and dates would, at least in the context of

a motion to dismiss, be contrary to the purpose of the False Claims Act.  *See Martin-Baker*, 389

F.2d at 1258 ("[T]his circuit provides an avenue for plaintiffs unable to meet the particularity

standard because defendants control the relevant documents—plaintiffs in such straits may allege

lack of access in the complaint."); *see also United States ex rel. Bender v. N. Am. Telecommc'ns

Inc.*, 499 F. App'x 44, 45 (D.C. Cir. 2013) ("[T]he law permits a *qui tam* relator . . . to proceed if

he provides the factual basis for the charges leveled against the defendant and some factual basis

for the claim that the defendant is in control of the information that the relator requires in order

to plead with particularity." (citations omitted)).

   Accordingly, the Court will deny Satory's motion to dismiss as to Counts I and II.

### D.  Count III: False Statements

   In Count III, Plaintiffs assert that "Satory knowingly made, used or caused to be

made or used numerous false records and statements to obtain approval and payment for the false

and fraudulent claims submitted to DOJ."  Compl. ¶ 79.   Satory asserts that this count should be

dismissed because Plaintiffs "provide nothing in the way of time, place, or contents of any

purportedly false representations, nor do they 'link' the scheme to claims for payment made by

the United States."  Def. MTD at 12; *see also* Def. Reply at 11–13 (arguing that the Plaintiffs

"provide no details as to the alleged fraudulent invoices that were submitted, including the

amount which the Government was overbilled, the dates on which the invoices were submitted,

or even the individuals who certified the invoices").  Plaintiffs respond that they "provided

significant details as to the content time, and place of Satory's misrepresentations," including

"the names of employees who billed work to the DOJ contract while actually working in DOJ offices at the 2Con building on corporate matters unrelated to the DOJ, 'for weeks in October, November, and December,' of 2010, and the managers who instructed them to do so." Pls. Opp. at 14–15.

The FCA provides a cause of action against any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). "Material" is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4).[5] Thus, under the post-amendment FCA, a plaintiff must allege that (1) the defendant made or used a "record or statement;" (2) the record or statement was false; (3) the defendant knew it was false; and (4) the record or statement was "material" to a false or fraudulent claim. *Id.* § 3729(a)(1)(B). Because Rule 9(b) applies, "the pleader must state the time, place and content of the false misrepresentations [and] the fact misrepresented." *Joseph*, 642 F.2d at 1385 (interpreting prior section (a)(2)).

The Court concludes that Messrs. Robin and Maxon have sufficiently alleged a false statement violation. Plaintiffs alleged that Satory submitted invoices along with a certification that "Satory's billing conformed to the contract" and that the certification was false because Satory was misrepresenting its compliance with the contract. Compl. ¶¶ 75, 77, 79.

---

[5] In the post-amendment version of the FCA, "[t]he false statement clause was renumbered from 31 U.S.C. § 3729(a)(2) to 31 U.S.C. § 3729(a)(1)(B)," and the clause was changed "from 'false record or statement to get a false or fraudulent claim paid or approved by the government' to 'statement material to a false or fraudulent claim.'" *United States ex rel. Folliard v. Gov't Acquisitions, Inc.*, 880 F. Supp. 2d 36, 39 (D.D.C. 2012). The FCA also now defines "material." "[U]nder new § 3729(a)(1)(B), the relator need only show a 'knowing' frame of mind similar to that required under [prior § 3729(a)(1)], rather than demonstrate the specific intent to defraud formerly required under § 3729(a)(2)." *United States ex rel. Nowak v. Medtronic, Inc.*, 806 F. Supp. 2d 310, 343 (D. Mass. 2011).

Indeed, in having expressly alleged that Satory submitted a false certification for payment, Plaintiffs here are on stronger footing than plaintiffs in so-called "implied certification" cases, in which plaintiffs rely only on "a statute, regulation, or contractual provision [that] makes compliance with a requirement an express condition precedent to payment." *TDC Mgmt. Corp.*, 24 F.3d at 296–97.

Satory's argument as to particularity under Rule 9(b), which is effectively identical to its argument as to Counts I and II, fails for the same reasons discussed above regarding Plaintiffs' presentment allegations. *See United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1227 (11th Cir. 2012) (finding allegations of a false statement claim sufficient and reasoning that "Relators' allegations are particular because they establish exactly how the Defendants violated the [Corporate Integrity Agreement], including when the violations occurred, who directed and performed the violations, how and which accounts were affected, and what the Defendants gained as a result."). The Court will thus deny Satory's motion to dismiss as to Count III.

### E.  Count IV: False Claims Retaliation

Plaintiffs allege in Count IV that they were "discharged, suspended, threatened, harassed, and in other manners discriminated against in the terms and conditions of their employment by Satory because of lawful acts" they performed "in furtherance of a False Claims Act action," including their investigation. Compl. ¶ 82. According to Satory, Messrs. Robin and Maxon "failed to allege that they ever participated in a protected activity under the FCA" because they never "raised concerns about Satory's alleged fraudulent billing practices" but instead "merely raised concerns about their employment grievances and concerns that Satory was somehow impermissibly performing work in government facilities." Def. MTD at 14; *see also* Def. Reply at 13–15 (arguing that Messrs. Robin and Maxon "have only alleged a scheme

whereby a company possibly *could* defraud the Government, not a situation whereby Satory actually *did* defraud the Government").

Messrs. Robin and Maxon respond that they alleged that they challenged Satory's practice of billing DOJ "for hours its employees spent doing work unrelated to the DOJ contract," Satory's "use of DOJ offices and resources for its own purposes," and "its abuse of the access it gained under the DOJ contract to erect barriers to competition and position itself for additional work." Pls. Opp. at 15–16. Plaintiffs argue that these concerns, raised to CEO Isaacs and others, went beyond "concerns of mere regulatory compliance." *Id.* at 16.

The FCA incorporates broad anti-retaliation protection for whistleblowers. At 31 U.S.C. 3730(h)(1), the law provides: "Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop [one] or more violations of this subchapter." "To make out a claim of retaliation under the FCA, an employee must demonstrate that: '(1) he [or she] engaged in protected activity . . . and (2) he [or she] was discriminated against because of that activity.'" *Sharma v. District of Columbia*, 881 F. Supp. 2d 138, 141–42 (D.D.C. 2012) (quoting *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1988)) (alterations in original). To make out the second element, "the employee must show that: (a) 'the employer had knowledge the employee was engaged in protected activity'; and (b) 'the retaliation was motivated, at least in part, by the employee's engaging in [that] protected activity.'" *Yesudian*, 153 F.3d at 736 (quoting S. Rep. No. 99-345, at 35, reprinted in 1986 U.S.C.C.A.N. at 5300); *see*

*also United States ex rel. Schweizer v. Oce N.V.,* 677 F.3d 1228, 1237 (D.C. Cir. 2012).  The

"protected activity" prong sweeps broadly; "§ 3730(h) does not require the employee to know

that the investigation he was pursuing could lead to a False Claims Act suit."  *Schweizer*, 677

F.3d at 1238 (citation and internal quotation marks omitted).  Moreover, "[t]o come within

§ 3730(h), an employee does not have to alert his employer to the prospect of a False Claims Act

suit."[6]  *Schweizer*, 677 F.3d at 1237. The key question on causation is: did the employer

discriminate against the employee "'because of lawful acts' she took 'in furtherance of' a False

Claims Act suit?"  *Id.* at 1239 (quoting *Martin-Baker*, 389 F.3d at 1261–62).

        The Court finds that Plaintiffs have stated a claim for FCA retaliation.  First, they

have alleged that they engaged in protected activities on several occasions.  Mr. Robin

complained to Mr. Rosario about the configuration of the servers during the Lab Migration

Project, Compl. ¶ 30; Messrs. Maxon and Robin, among others, questioned Ms. Isaacs about the

propriety of Satory's private corporate work while on DOJ facilities using DOJ resources, *id.*

¶¶ 36–37, 39-40; after being instructed to construct the DevLab in a way he considered wasteful

and unethical, Mr. Robin complained to Mr. Rosario and wrote an e-mail to Satory management

stating that "DOJ Leadership [should] be made aware of Satory's proposal for controlling access

to the DOJ Lab," *id.* ¶¶ 53–55; and Mr. Robin raised his concerns during two face-to-face

meetings in January 2011, once to Messrs. Rosario and Elliott and once to Mr. Elliott and Ms.

Gamse, *id.* ¶¶ 56–58, 64.  These reports are sufficient to show that Plaintiffs engaged in

protected activity.  *See Yesudian*, 153 F.3d at 740 (finding sufficient protected activity when,

---

[6] Because there is no allegation here that Plaintiffs' "normal job activities" involved reporting
compliance, this case does not fall within the *Martin-Baker* rule requiring a special showing of
notice.  *See Martin-Baker*, 389 F.3d at 1261–62 (requiring that a plaintiff whose regular duties
include reporting compliance show "acting outside her normal job responsibilities" or "notifying
a party outside the usual chain of command").

*inter alia*, relator "repeatedly advised . . . superiors" of alleged wrongdoing because Congress intended "to protect employees while they are collecting information about a possible fraud, before they have put all the pieces of the puzzle together" (citations omitted)).  For many of the same reasons discussed in the context of Plaintiffs' other FCA claims, discussed above, Satory's argument that Plaintiffs raised "merely raised concerns about their employment grievances and concerns" is, simply, nonsense.

      As to the second prong, Plaintiffs have established that Satory "had knowledge [they] were engaged in protected activity," given their repeated complaints to supervisors, including Satory's CEO, Ms. Isaacs.  *See Yesudian*, 153 F.3d at 736.  Moreover, they have alleged that they suffered discrete, adverse employment consequences from Satory's retaliation—constructive discharge for Mr. Maxon on March 8, 2011, Compl. ¶ 68, and termination for Mr. Robin on March 17, 2013, *id.* ¶ 73; *see also id.* ¶¶ 85–88.  As to the final element the Plaintiffs need to allege—that the retaliation "was motivated, at least in part, by the employee's engaging in [that] protected activity," *Yesudian*, 153 F.3d at 736 (alteration in original, citation omitted)—Plaintiffs have made sufficient allegations connecting changes in the "terms and conditions" of their employment to their FCA-protected activities.  Mr. Robin was removed from the position of Lab Manager on January 12, 2011 following two "heated" confrontations in which Mr. Robin alleged that the proposed DevLab architecture was anticompetitive and unethical and after Mr. Robin sent an e-mail to management proposing that "DOJ Leadership be made aware of Satory's proposal for controlling access to the DOJ Lab." *Id.* ¶¶ 53–55.  Mr. Robin alleges that he was then no longer given work and, following an in-person complaint to Ms. Isaacs, was terminated on March 17, 2011.  *Id.* ¶ 73.  Mr. Maxon took part in, *inter alia*, raising concerns about Satory's use of DOJ's facilities for private corporate

gain, *id.* ¶¶ 39–40, and he alleges that he was constructively discharged "because of the abusive conduct he saw at Satory." *Id.* ¶ 68. At this stage of the case, the evidence of retaliation against Mr. Robin is more direct and probative than that of retaliation against Mr. Maxon. Nonetheless, the allegations provide sufficient support for Plaintiffs' allegations that they were subjected to retaliation at least in part "because of lawful acts" they took regarding what eventually became this FCA case. *See* 31 U.S.C. § 3730(h)(1). Therefore, the Court will deny Satory's motion to dismiss as to Count IV.

### F. Count V: Wrongful Termination

Plaintiffs assert that Satory terminated Mr. Robin and constructively discharged Mr. Maxon after Satory became aware of their complaints that Satory was violating the FCA, in violation of District of Columbia law. *Id.* ¶¶ 85–88. This count should be dismissed, Satory argues, because "neither Mr. Maxon nor Mr. [Robin] can establish that their termination or voluntary separation from employment was caused by their participation in any protected activity and . . . because their claim does not fit within the narrow confines of the at-will employment exception under D.C. law." Def. MTD at 14. "[B]ecause the FCA provides for a specific and significant remedy" for the Plaintiffs' allegedly wrongful discharges, Satory argues that the Plaintiffs cannot also bring a claim for improper termination of their at-will employment with Satory on the ground that they opposed illegal activity. Def. MTD at 15–16 (internal citation and quotation marks omitted); *see also* Def. Reply at 16.

Plaintiffs respond that their allegations are sufficient because they "objected to Satory's failure to comply with regulations," which falls within the recognized exceptions to the at-will employment doctrine under D.C. law. Pls. Opp. at 17–18 (citing, *inter alia, Byrd v. VOCA Corp.*, 962 A.2d 927, 934 (D.C. 2008)). As to whether the FCA remedy prohibits them from suing under D.C. common law, Plaintiffs assert that they have pled the two claims in the

alternative, as they are permitted to do, especially here where they made complaints on several occasions and some of those individual complaints may ultimately be analyzed under common law.  Pls. Opp. at 18.

"It has long been settled in the District of Columbia that an employer may discharge an at-will employee at any time and for any reason, or for no reason at all."  *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 30 (D.C. 1991).  District of Columbia courts recognize a "public policy exception" for cases in which "the employee's termination offends some 'mandate of public policy' that is 'firmly anchored in either the Constitution or in a statute or regulation which clearly reflects the particular public policy being relied upon and . . . [in which that policy] arise[s] from a statute or regulation that does not provide its own remedy.'" *Bilal-Edwards v. United Planning Org.*, 896 F. Supp. 2d 88, 93–94 (D.D.C. 2012) (quoting *Carson v. Sim*, 778 F. Supp. 2d 85, 97 (D.D.C. 2011)).  One such exception is "where an employee suffers an adverse action for refusing to break the law or for following the law to the detriment of her employer." *Id.* (quoting *Chisholm v. District of Columbia*, 666 F. Supp. 2d 96, 117 (D.D.C. 2009)).  The D.C. Court of Appeals has made clear that the public-policy exception does not apply "where the very statute creating the relied-upon public policy already contains a specific and significant remedy for the party aggrieved by its violation." *Nolting v. Nat'l Capital Grp., Inc.*, 621 A.2d 1387, 1390 (D.C. 1993) (holding that D.C. Worker's Compensation Act, containing "a specific remedy for any . . . unlawful retaliatory action," barred common-law wrongful-discharge claim).

The D.C. Circuit applied the *Nolting* rule approvingly in *Kassem v. Washington Hospital Center*, 513 F.3d 251, 254–55 (D.C. Cir. 2008), affirming dismissal of a wrongful-discharge claim because the employee had an anti-retaliation remedy under Energy

Reorganization Act, 42 U.S.C. § 5801 *et seq.*  The *Kassem* court rejected the plaintiff's argument that the statutory and common-law remedies could be pursued in tandem, finding of no legal significance that the plaintiff "was not required" to elect the statutory remedy.  513 F.3d at 254–55.  A judge of this Court has since extended the *Nolting* rule to the circumstance presented in this case—*i.e.*, a claim for common law wrongful discharge under D.C. law when the employee relies on an alleged breach of the False Claims Act.  *See Elemary v. Philip Holzmann, A.G.*, 533 F. Supp. 2d 116, 136 (D.D.C. 2008) ("Because [a suit under 31 U.S.C. § 3730(h)] lies open to her, Elemary may not invoke the public policy exception to the at-will employment doctrine.").  Plaintiffs make no attempt to distinguish their claim from *Elemary* or *Kassem*, and their argument that they should be allowed to state claims in the alternative, Pls. Opp. at 18, fails because the presence of an "alternative remedy" in the FCA "*extinguishes*" a common law claim as a matter of law.  *Kassem*, 513 F.3d at 255 (emphasis added).  Thus, it is not a matter of pleading claims in the alternative; there simply is no claim for common-law wrongful discharge available to Messrs. Maxon and Robin here.  The Court will grant Satory's motion to dismiss as to Count V.

### G.  Count VI: Breach of Employment Contract

Count VI encompasses Plaintiffs' allegation that Satory "breached its employment contracts" with them.  Compl. ¶ 91.  Satory contends that neither Mr. Maxon nor Mr. Robin has alleged the existence of an employment contract and that, even if their offer letters could be construed as employment contracts, Satory at most agreed to at-will employment.  Def. MTD at 16–17.

The offer letters "clearly were general offers of employment [that] specifically noted that their 'position and . . . activities and services may change.'"  Def. Reply at 20.  "In the District of Columbia, absent express language indicating particular terms or duration of

employment, the employment relationship is presumed to be at-will.  This presumption applies

unless the parties state clearly their intention to limit the employer's right to terminate, such as

by a contract provision setting out employment for a fixed term or language that allows

termination only for cause." *Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61, 67–68 (D.D.C.

2005) (citations and internal quotation marks omitted).  The employment letters and relocation

agreements at issue here stated that Plaintiffs' employment was at-will.  *See* Robin Offer Letter

at 2, Robin Relocation Expense Agreement at 1, Maxon Offer Letter at 2, Maxon Relocation

Expense Agreement at 1.  Plaintiffs have no claim for breach of employment contract arising

from their allegedly wrongful terminations.

   Conceding that fact, Plaintiffs change tack in their opposition brief, instead

arguing that Satory violated their Offer Letters and Relocation Expense Agreements by not

paying relocation expenses and by placing them in different roles than those stated in the Offer

Letters.  *Id.* at 19–20 (acknowledging that Plaintiffs "do not allege that Satory breached the

contract by terminating them").  This, too, is a row too tough to hoe because even assuming

*arguendo* that the Relocation Agreements and Offer Letters were legally effective as contracts,

Plaintiffs have made no allegation that any contractual terms were breached.  Despite the vague

statements in their opposition brief, they have made no allegation of relocation expenses that

went unpaid or identified any terms of a contract that Satory allegedly broke other than assigning

different duties than they anticipated.  *See Ponder v. Chase Home Fin., LLC*, 865 F. Supp. 2d 13,

18 (2012) (observing that existence of an "obligation or duty arising out of the contract" is an

essential element of a breach of contract claim under D.C. law (citing, *inter alia*, *Tsintolas Realty*

*Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)).  Plaintiffs cannot couch their claims as arising

from changed job duties because the job duties portions of both Offer Letters were non-

committal, general, and unrestricted.   The letters stated: "Your initial role within the company will be working as [title]," that this role would "be explained in more detail during your orientation session," that the duties listed were non-exhaustive, and that "the services and activities [provided by Plaintiffs] may change."   Maxon Offer Letter at 1, Robin Offer Letter at 1.  Plaintiffs were unhappy with the tasks Satory assigned them, as is evident, but nothing in the Offer Letters required Satory to give Plaintiffs specific responsibilities or prohibited Satory from giving different assignments.  *See Washington v. Thurgood Marshall Acad.*, Civ. No. 03-2570 (CKK), 2006 WL 1722332, at *9–10 (D.D.C. June 19, 2006) (rejecting breach of contract claim based on changed job duties because "it is clear that the description of 'Duties and Responsibilities' in the Employment Contract is flexible and open-ended").  Satory's motion to dismiss will thus be granted as to Count VI.

### H.  Count VII: Punitive Damages

In Count VII, Plaintiffs demand punitive damages as a remedy for actions taken by Satory "with evil motive, actual malice, deliberate oppression, with intent to injure, and in willful disregard for [their] rights."  Compl. ¶ 95.  Satory argues that this count should be dismissed because "punitive damages is available to a plaintiff as a remedy and is not a free-standing cause of action."  Def. MTD at 18–19 (citing, *inter alia*, *Int'l Kitchen Exhaust Cleaning Ass'n v. Power Washers of N. Am.*, 81 F. Supp. 2d 70, 74 (D.D.C. 2000)).

Because Plaintiffs concede that this claim "need not be formally plead as a count in their complaint," Pls. Opp. at 20, the Court will grant Satory's motion to dismiss as to Count VII.

### IV.  CONCLUSION

For the foregoing reasons, Satory's motion to dismiss will be denied as to Counts I through IV.  The motion will be granted as to Counts V, VI, and VII because Plaintiffs have

failed to state claims for wrongful termination, breach of contract, or punitive damages.[7]  A

memorializing Order accompanies this Opinion.

DATE: May 23, 2013

_____
/s/
ROSEMARY M. COLLYER
United States District Judge

---

[7] Plaintiffs note in passing that they "request that the Court . . . grant them leave to amend their complaint consistent with the Court's decision."  Pls. Opp. at 20.  If Plaintiffs wish to seek leave to amend their Complaint, they must file a motion setting forth valid reasons for doing so, together with a proposed amended complaint.  *See* LCvR 7(i).  As to the claims dismissed in this Opinion, however, the Court notes that amendment would likely be futile for the reasons stated in this Opinion.  *See Howell v. Gray*, 843 F. Supp. 2d 49, 54 (D.D.C. 2012).